## THE RANDWYCK.

(District Court, D. Maryland. February 3, 1915.)

SHIPPING ☞126—LIABILITY OF VESSEL—LOSS OF CARGO THROUGH NEGLIGENT DELIVERY.

A steamship, although entitled by the terms of the bill of lading to deliver a part cargo of kanit in bulk from her deck, undertook for mutual convenience to deliver it overside through a chute on the deck of a scow furnished by the shipper. She sent two men on the scow to trim. When partly loaded the scow listed, then turned over, and all the cargo loaded thereon was lost. The evidence tended to show that the scow did not leak. *Held*, on the evidence, that the cause of the capsizing was the failure to keep the cargo trimmed properly or with sufficient rapidity as it came aboard, and that the ship was liable for the loss to the shipper.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 461–464; Dec. Dig. ☞126.]

In Admiralty. Suit by the Piedmont-Mt. Airy Guano Company against the steamship Randwyck and the Holland-American Line, owner thereof. Decree for libelant.

Arthur D. Foster, of Baltimore, Md., for libelant.

John B. Deming and W. Thomas Kemp, both of Baltimore, Md., for respondents.

ROSE, District Judge. The Piedmont-Mt. Airy Guano Company is the libelant. It will be called the shipper. The steamship Randwyck belongs to the Holland-American Line. It will be spoken of as the ship. At Rotterdam the shipper delivered to it for transportation to Baltimore 557 bags of potash and 214,172 kilograms of kanit in bulk. By the bill of lading the merchandise in question was to be "delivered from the ship's deck (where the shipowner's responsibility shall cease)." It was further therein provided that the ship should be free from liability arising from fault of stevedores in its service. Upon the arrival of the ship at Baltimore, the shipper, on Friday morning, December 11th, sent a lighter or scow belonging to it alongside the ship. On the early morning of Saturday some 27 bags of potash were put upon the scow. Nothing further was transferred to it until about 9:50 Saturday night. By that time all the rest of the ship's cargo had apparently been discharged. In the next five hours some 150 tons of kanit and 80 additional bags of potash were put upon the scow. At about 3 o'clock on Saturday morning it turned over against the ship with such force that the house which covered nearly the whole of its deck was swept off by the impact. The turning movement continued until the scow floated bottom upwards. The potash and kanit on board were a total loss. It is not disputed that by the injury to the scow and the destruction of the merchandise upon it the shipper was damaged to the amount of $5,249.18. This sum it seeks to recover from the ship.

For the discharge of the kanit a chute was slung over the ship's side, its lower end passing through the hatch or doorway in the top and side of the scow. The kanit was hoisted out of the ship's hold in

buckets which held about a ton each. These buckets were emptied into the chute, down which their contents ran, and from the lower end of which the kanit fell on the scow's deck. The ship kept two men on the scow to trim the cargo as the chute delivered it. When as great a weight of kanit as it was desirable to place on one portion of the scow had been put upon it, the operation was suspended until the scow was moved by those in charge of the ship to such a position that the chute would discharge through another hatchway.

The shipper says that the accident was the direct result of the negligent manner in which the kanit was transferred from the ship to the scow. It produces on its behalf only one witness, who was present when the scow capsized. He is its employé—a colored man in charge of the scow. He testifies that, when as much weight as he thought could with safety be put on one end of the scow had come aboard of it, he asked to have the scow moved. He was told it would be moved later. He had to ask a second time before the removal was made. He says he called the attention of those on the ship to the fact that the chute was too short, in consequence of which all the kanit fell on that side of the scow nearest the ship. The kanit was damp, and in that condition will not trim itself. He noticed the scow was listing, and that the two trimmers were not able to handle it fast enough for safety. He asked for more men, but the "boss" told him "he didn't have anybody else to put aboard to get her on her feet." The scowman took a lamp and went down below to see if the scow had sprung a leak. He could find no water. He went along one side of the hold of the scow and could find no leak. Before he could go along the other side there was an alarm. He hurried to tell the man on the ship, but before he could get to him the scow had listed nearly on the ship. He hollered "to put some men," and told those on the ship "to stop pouring the stuff on board," but they kept on and the scow turned over.

If the story be true, the liability of the ship would seem to be clear. It might have required the shipper to accept delivery on its deck, but for the mutual convenience of both parties it preferred to deliver on board the lighter. In doing that, as in doing anything else, it was bound to use reasonable care to prevent injury to the property of another. The first section of the Harter Act prevents it from exempting itself from liability for negligent delivery. The ship asserts, however, that the story of the scowman is untrue. The foreman of stevedores says that no complaint was made to him that the chute was too short, and in point of fact it was long enough, that no request for additional trimmers was ever made, and the scow was moved as soon as he was asked to move it. The night superintendent of the Holland-American Line confirms the foreman as to the length of the chute and generally on other points, although, as he was not always on the ship, the weight of his corroboration as to matters other than the length of the chute is not great. The deckman and the winchman testify that they did not hear any such complaint as the scowman said he made.

The ship claims that the scowman's testimony as to what happened is discredited by admissions made by him immediately after the accident. He was questioned by the night superintendent already men-

tioned. Two other persons were present, viz., the foreman of steve-
dores before referred to and a customhouse inspector. The latter is a
disinterested witness. He says:

The night superintendent asked, "What made the scow turn over?" The
scowman replied, "I don't know." He was asked, "Was she being loaded
properly?" He replied, "Yes, sir." Then followed the question, "Well, was she
leaking?" and the answer, "I do not know, sir." To the interrogatory, "What
do you think made it turn over?" he replied, "I do not know, sir." Then the
superintendent said: "I never like to load a scow unless the scowman is pres-
ent for that reason. Then if there is any complaint why she is not being
loaded right, or anything like that, he can say so."

The only significant thing in this conversation would be the scow-
man's assent that she was being loaded properly. When the superin-
tendent comes to tell the story of the same conversation, he says:

He asked the scowman, "Captain, was your scow trimmed right?" and re-
ceived the reply, "Yes, sir." The witness then said, "You must have sprung
a leak," and the scowman replied, "It must have been something, because the
water was in her; she must have sprung a leak mighty quick."

The foreman of the stevedores gives still another account. He says:

The superintendent asked if the scow was leaking. The scowman said he
did not know. He was asked, "Is there any water in it?" He answered, "A
little." To the question, "Well, is she leaking?" he said: "I don't know, sir.
Well, that is not the first time she turned over. She turned over twice before.
The scow can go, but I have got a $15 overcoat aboard, gone down with her.
The scow is level. It could not be trimmed better than it was."

The scowman admits that there was a conversation at which the other
three persons were present. According to him, the superintendent ask-
ed him why the scow turned over. He replied, "The scow was on an
even keel." Then the superintendent said, "She must have sprung a
leak," to which the scowman replied, "No." The superintendent there-
upon asked, "Then you want to say that we loaded the scow all right;
that she was on her feet when she turned over?" to which the scow-
man answered, "That is a hard matter for me to say." He specifically
denies that he said the cargo was trimmed all right.

These different versions of the conversation show how unsafe it is
greatly to rely on the recollection of hearers as to the precise things
that are said on such occasions. The scowman testifies that he never
said that the scow had turned over twice before. It seems to be satis-
factorily established that the scow had never turned over before at
all. The customhouse inspector, who was present at the conversation,
says that the scowman said he did not know she was leaking. The su-
perintendent testifies that he said that "there was water in her; she
must have sprung a leak very quick."

In such times of excitement witnesses who put questions and are
anxious to have particular answers are exceedingly likely to construe
silence or noncommittal replies as assents to their views. On the
whole, I am not disposed to think that the scowman said anything at
that time which materially, if at all, affects the weight to be given to
his testimony in court. He impressed me quite favorably. Yet, in view
of the fact that he was contradicted on each of several vital points by
two or more witnesses, I should feel constrained, if the evidence stop-

ped there, to hold that the libelant had not established its case by the required preponderance of proof.

But there is other testimony, and that of a very significant nature. The scow overturned. It had been used for some years, and apparently had never met with an accident before. There was nothing in the weather conditions or in any extraneous influences to which it was at the time subjected to account for what happened. It seems to be certain that it capsized either because it sprung a leak or because the cargo was improperly placed upon it. It admittedly was not overloaded. The testimony that it could not have sprung a leak is quite conclusive. On the day upon which it turned over, an experienced marine surveyor and insurance adjuster saw it floating in the dock. He testifies that its hull was so far out of water as to convince him that a great deal of air still remained in it, which would not have been the case had the disaster been caused by a leak. The scow was righted and taken to the shipyard and placed upon a marine railway. It was there surveyed by the witness last mentioned and by another, an equally experienced representative of the ship. They agreed that they could find no leak in her; that the only damage to her was such as naturally resulted from the contact of her upper works with the side of the ship as she turned over.

The ship suggests that some of her seams, which were above water when she was light, might have under these conditions opened; that when a load was placed on her those seams went under water, and that the lighter filled, but that so soon as her timbers and planking became wet they again expanded and closed the seams. Conceivably such a thing may happen. There is not a shadow of evidence that in this case it did. She remained in the shipyard for some three weeks, of course without any cargo on board, and yet it was not found necessary to caulk any of her seams. Under this state of the proof, the probability, if not the possibility, of the accident having been due to any leak would appear to be effectually disproved. The story of the scowman, if true, accounts fully for what happened. There was nothing in his manner or appearance to make me think that it was not true.

It follows that the ship is liable for the damage done the shipper.